**STATE of Minnesota, Respondent,**

v.

**David Eugene WRIGHT, Appellant.**

No. A03–1197.

Supreme Court of Minnesota.

Aug. 11, 2005.

Office of the State Public Defender, Leslie J. Rosenberg, Assistant State Public Defender, Minneapolis, MN, for Appellant.

Mike Hatch, Minnesota State Attorney General, St. Paul, MN, Amy J. Klobuchar, Hennepin County Attorney, Jean E. Burdorf, Assistant County Attorney, Minneapolis, MN, for Respondent.

Beverly Balos, University of MN Law School, Minneapolis, MN, for Amicus Curiae MN Coalition for Battered Women.

Carolyn Ham, Minneapolis, MN, for Battered Women's Justice Project.

## OPINION

ANDERSON, PAUL H., Justice.

Appellant David Eugene Wright was convicted in Hennepin County District Court on two counts of felony assault in the second degree. The convictions were based on Wright pointing a firearm at his then-girlfriend R.R. and her teenage sister during an argument that took place in the early morning hours at the apartment Wright shared with R.R. Wright was also convicted of one count of being a prohibited person in possession of a firearm. The Minnesota Court of Appeals affirmed Wright's convictions, and he then appealed to our court.

While Wright listed several grounds for appeal, we granted his petition for review only with respect to the issue he raised implicating the United States Supreme Court's decision in *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). This issue requires us to determine whether Wright's Confrontation Clause rights under the U.S. Constitution were violated when the district court admitted recorded statements made by R.R. and her sister to a 911 operator and statements they made to police officers at R.R.'s apartment during the course of the officers' initial, on-scene field investigation. We conclude that Wright's Confrontation Clause rights were not violated by admission of the statements and, therefore, we affirm.

On November 24, 2002, appellant David Eugene Wright was living with his girlfriend, R.R., in an apartment on Oak Grove Street in Minneapolis. At about 3:00 a.m., a Minneapolis 911 operator received a hang-up call originating from an apartment at the same street address. The operator dispatched police officer Mark Lanasa to that address. While Lanasa was en route, the 911 operator received a second call from the same location

("the 911 call"), during which R.R. described Wright and told the operator that Wright earlier had "pulled a gun on me and my little sister." R.R. also told the operator that Wright had keys to her apartment, and that she was worried he might return. R.R. told the operator: "I'm so scared right now, ma'am. I'm sorry I don't want to talk too loud." R.R. then put her sister on the phone. The sister, who was staying with R.R. that weekend, said that she was frightened and concerned that Wright had keys to the apartment and might return. The operator then relayed to Lanasa the information that was obtained during the 911 call, including a physical description of Wright.

As Lanasa was receiving the information from the 911 operator, he noticed a man matching Wright's description on the sidewalk west of LaSalle Street on Oak Grove. Lanasa turned his car around to face the direction that the man was walking. He then yelled at the man to stop walking and to raise his hands, but the man took off running. Wright, who was the man Lanasa spotted, testified that he ran because it was late at night and he was scared and uncertain about what would happen.

Lanasa testified that as he followed Wright in the squad car, he noticed Wright holding a black, semi-automatic handgun in his right hand. Wright turned into an alley and was traveling through the alley when Lanasa came around the corner and noticed that Wright's hands were empty. Wright then climbed over an eight-foot high chain link fence. Lanasa again yelled at Wright to stop and threatened to release a police dog if Wright did not stop. Lanasa testified that Wright continued running, but Wright testified that at this point he stopped and put his hands in the air.

Lanasa testified that he traveled around the block, positioned his squad car beside Wright, and pushed a button to open the door that released the police dog, which pursued Wright. The dog caught up to Wright at the entrance of the Market Bar–B–Que restaurant and grabbed him by the right leg. Lanasa, who continued to pursue Wright, jumped out of his car with his gun drawn, forced Wright to the ground, and told Wright to show his hands. Wright kicked at the dog while the dog bit him, and Lanasa then kicked Wright several times. Lanasa testified that Wright subsequently put out his hands and said, "I don't have the gun anymore." Lanasa then handcuffed Wright. At trial, Wright denied having had a gun in his hands while Lanasa chased him. Wright also testified that he did not say that he no longer had a gun because there was no reason for him to make such a statement to Lanasa.

A police officer who arrived to assist Lanasa searched the scene and found a gun under a parked car in the Marker's Liquor Store lot, near the alley that Wright traveled through as Lanasa was chasing him. The gun was a Smith & Wesson, 915 semi-automatic. Lanasa testified that this gun appeared to be the same weapon he saw Wright holding in his right hand. A police investigator testified that a test for fingerprints yielded no "positive results"—that is, there were no fingerprints on the gun that matched Wright's.

Meanwhile, at 3:13 a.m., Officer Heidi Weeks and her partner were dispatched to the Oak Grove address to begin an initial, on-scene field investigation. While en route, they heard Lanasa broadcast over the police radio that he had been chasing Wright. Weeks and her partner went to assist Lanasa, and when they arrived at the scene of the arrest, they placed Wright in the back seat of their squad car. Weeks and another officer, Adam Lewis, then walked to R.R.'s apartment.

When Weeks and Lewis arrived at the apartment around 3:45 a.m., they observed that R.R. was crying and shaking uncontrollably, and trying to take deep breaths to calm herself down. R.R. was having a hard time talking to the officers, and told the officers that she was really scared. Lewis asked R.R. if they could go up to her apartment to take her statement because the doorway was small and there was no place to sit. When the officers arrived at the apartment, R.R.'s sister was sitting on the sofa, crying.

Weeks spoke to R.R. for about a half hour. Weeks testified that throughout their conversation, R.R.'s demeanor did not change—"[s]he continued to cry and sob and have a hard time breathing in talking to us throughout the time that I was speaking with her." R.R. said she was concerned about whether Wright was in custody and whether he might be released. While Weeks talked with R.R., Lewis talked with R.R.'s sister, who described the events in a manner consistent with how R.R. described them. R.R.'s sister also told Lewis that she was "scared to death," and that she believed Wright would return and shoot her.

R.R. and her sister then continued to recount the evening's events to the officers. Because R.R. and her sister did not testify at Wright's trial, their descriptions of the events were introduced through the officers' testimony. Wright's testimony concerning the events was largely consistent with the descriptions from R.R. and her sister, with some minor and one significant exception: he denied pointing a gun at R.R. and her sister—the act that gave rise to the felony assault charges. Unless otherwise noted, the facts recited below are consistent with both versions of the events.

During the field investigation interview at her apartment, R.R. told Weeks that she had lived in the apartment since the beginning of the month, and Wright had moved in with her about two weeks later. Wright testified that at the time of the incident, his relationship with R.R. had not been going well. He said that earlier that evening, R.R. came home late from work and rang the apartment to be let in because she did not have her keys. R.R.'s sister came to the door, told R.R. that Wright did not want to let R.R. into the apartment, but then let her in anyway. Wright testified that he and R.R. argued about her plans to go to a dance club. He said they then agreed that their relationship was not working, and decided to "leave each other alone."

At about 10:30 p.m., R.R. and her sister left the apartment. Wright said R.R. left for a dance club and her sister went to a party. R.R.'s sister was expected to return by 11:30 p.m. Wright had the apartment keys because he thought he was going to be leaving shortly, but instead he fell asleep on the sofa while waiting for R.R.'s sister to return. He awoke around 11:30 or 11:40 p.m. when R.R.'s sister telephoned to explain that she was on her way, and then he fell asleep again. At about 1:10 a.m., Wright awoke when R.R. telephoned, asking to be let into the building. When Wright left the apartment to let R.R. in, he saw R.R.'s sister sleeping in the hallway. The sister apparently had returned while Wright was asleep. Wright woke her up and told her to go inside the apartment. When Wright met R.R., he told her that her sister had been sleeping in the hallway, and R.R. then became upset.

When R.R. and Wright arrived at the apartment, R.R.'s sister was inside. Wright testified that he played video games while R.R. tried to sleep. Both R.R. and her sister made some comments to Wright about how he was irresponsible, and R.R. told Wright that their relationship was over. Wright told R.R. he would leave "on the first of the month."

Shortly thereafter, Wright put on his coat and said he was going to leave. Wright testified that he did not want to argue all night and thought that if he left and came back after R.R. had fallen asleep, he would not have to deal with her. Wright testified that when he went to retrieve the keys from the counter on which he had left them, he noticed that they were no longer there. Wright said that he asked R.R. for the keys, but she refused to give them to him. A heated argument ensued. At one point, R.R.'s sister tried to call 911, but Wright grabbed the telephone, pulled the receiver from the wall, and smashed it. Lewis testified that he found a broken phone with a cracked receiver when he interviewed R.R.'s sister.

During the police interview, R.R. told Weeks that Wright said "I'll show you" and he walked to the front closet, retrieved a dull silver and black gun from a black backpack, and returned to the living room. Wright then pointed the gun, which R.R. thought was loaded, at R.R.'s sister. Next, he pointed the gun at R.R. and said "little girl, shut your mouth," and then pointed the gun back at R.R.'s sister. Wright then left the apartment, at which time R.R. dialed 911 from a telephone in the bedroom. While interviewing R.R., Weeks found a black backpack in the front closet, which held a gun clip containing a few hollow-point rounds that could be used in a 9-millimeter-caliber gun.

Wright was charged with two counts of felony assault in the second degree, based on allegedly having pointed a gun at R.R. and her sister, in violation of Minn.Stat. § 609.222, subd. 1 (2004). Wright also was charged with one count of being a prohibit-

ed person in possession of a firearm, in violation of Minn.Stat. § 624.713, subds. 1(b) and 2 (2004). While preparing the case against Wright, the Hennepin County Attorney's office repeatedly telephoned R.R.'s sister, but was unable to reach her. A police investigator attempted several times to reach R.R., and when R.R. finally answered a telephone call, she told the investigator that she did not want to participate in the case. The investigator went to R.R.'s residence to deliver a subpoena, and when no one answered, he slid the subpoena under the apartment door. A domestic violence victims' advocate told the court that she had spoken with R.R., who said that she was concerned for her safety and her sister's safety if they were to testify. R.R. also was concerned that Wright still might have keys to her apartment, and told the victims' advocate that Wright had been telephoning her from jail. According to the advocate, Wright told R.R. that "if she doesn't do what he wants someone will come over to her house and do something to her."

Based on this information, the district court deemed both R.R. and her sister unavailable to testify. The court then admitted into evidence a tape and a transcript of the 911 call, as well as the statements R.R. and her sister made to the police. The court ruled that the statements were admissible under the excited utterance exception to the hearsay rule. The court explained that the statements made to Officers Weeks and Lewis at the apartment were distinguishable from formal police interviews. The court found that these statements were made "quite soon after the incident," were related to the assault, and were made while R.R. and her sister were "still under the influence [of the incident], still tearful, crying, very upset, had difficulty calming [ ] down, were still quite frightened."

A jury returned a verdict of guilty on all counts charged. The district court convicted Wright of two counts of assault in the second degree and one count of being a prohibited person in possession of a firearm. Wright received a sentence of 60 months for each count, to be served concurrently.

Wright appealed his convictions to the court of appeals, arguing that the district court abused its discretion by (1) admitting as excited utterances the statements R.R. and her sister made during the 911 call and the statements they made to the police at R.R.'s apartment; (2) admitting the statement Wright made when the police subdued him because he did not voluntarily make the statement; and (3) ruling that he could be impeached with his prior convictions of drug crimes, damage to property, and aggravated robbery. *State v. Wright*, 686 N.W.2d 295, 298 (Minn.App. 2004). Wright also argued that the state committed prejudicial misconduct during its closing argument. *Id.* In March 2004, while Wright's case was pending before the court of appeals, the United States Supreme Court issued its decision in *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177. The parties then addressed the *Crawford* issue in supplemental briefing.

The court of appeals affirmed Wright's convictions, and we granted his petition for review only with respect to the *Crawford* issue. Specifically, Wright argues that his rights under the Confrontation Clause of the United States Constitution were violated when the district court admitted the statements R.R. and her sister made to the 911 operator and to the police during their field investigation.

I.

For more than two decades, the admissibility of a declarant's out-of-court state-

ment under the Constitution's Confrontation Clause has been guided by the United States Supreme Court's decision in *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). Under *Roberts*, a declarant's out-of-court statement could be admitted under a hearsay exception if both (1) the declarant was unavailable at trial, and (2) the prosecution could demonstrate that the declarant's statement bore "sufficient 'indicia of reliability' to avoid a conflict with the confrontation clause." *State v. Hansen*, 312 N.W.2d 96, 102 (Minn. 1981).

On March 8, 2004, the Supreme Court rendered its decision in *Crawford*,[1] and significantly altered the rules governing the admissibility of testimonial out-of-court statements against criminal defendants at trial. In *Crawford*, the Court stated that the *Roberts* test departed from historical principles governing the admission of evidence because the test is both too broad and too narrow. 541 U.S. at 60, 124 S.Ct. 1354. The Court explained that the *Roberts* test is too broad because it applies the same mode of analysis regardless of "whether or not the hearsay consists of *ex parte* testimony." *Id.* The Court said that this broad application often results in close scrutiny of statements that are far removed from the Confrontation Clause. *Id.* The Court also said the test is too narrow because it allows for statements that *do* consist of ex parte testimony to be admitted upon a "mere finding of reliability," consequently "fail[ing] to protect against

paradigmatic confrontation violations." *Id.*

In *Crawford*, the Supreme Court said that "[m]embers of this Court and academics have suggested that we revise our doctrine to reflect more accurately the original understanding of the [Confrontation] Clause." *Id.* The Court noted two proposals for revising the doctrine:

> First, that we apply the Confrontation Clause only to testimonial statements, leaving the remainder to regulation by hearsay law—thus eliminating the overbreadth referred to above. Second, that we impose an absolute bar to statements that are testimonial, absent a prior opportunity to cross-examine—thus eliminating the excessive narrowness referred to above.

*Id.* at 61, 124 S.Ct. 1354. The Court considered the first proposal in *White v. Illinois*, 502 U.S. 346, 352–53, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992), but rejected it. In *Crawford*, the Court did not explicitly say whether its holding in *White* survives *Crawford*, but the Court did state that the analysis in *Crawford* "casts doubt on that holding" and that the analysis "squarely implicate[s] the second proposal." *Id.*

The Supreme Court then went on to state that

> the Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the

---

1. *Crawford* involved an appeal of a Washington Supreme Court's decision upholding a defendant's conviction for assault. On the night of the incident, the defendant and his wife had gone looking for the victim because the victim had allegedly tried to rape her. The two found the victim at his apartment, and a fight ensued in which the victim was stabbed in the torso and the defendant's hand was cut. The police apprehended the defen-

dant and his wife, read them *Miranda* warnings, and interrogated them at the police station. During her interrogation, the wife gave a tape-recorded statement that incriminated the defendant. At trial, the defendant claimed self-defense, and the wife did not testify due to marital privilege. Over the defendant's objection, the court allowed the state to introduce the wife's tape-recorded statements.

crucible of cross-examination. The Clause thus reflects a judgment, not only about the desirability of reliable evidence (a point on which there could be little dissent), but about how reliability can best be determined.

*Id.* at 61, 124 S.Ct. 1354. The Court then explained that by allowing a jury to hear evidence based on a "mere judicial determination of reliability" without being tested by the adversarial process, the *Roberts* test "replaces the constitutionally prescribed method of assessing reliability with a wholly foreign one." *Id.* at 62, 124 S.Ct. 1354.

The Supreme Court said that it could resolve the matter in *Crawford* by reweighing the *Roberts* reliability factors. *Id.* at 67, 124 S.Ct. 1354. But, by implication, the Court appeared to acknowledge that if it did so, the *Roberts* standard would still remain vague. *Id.* The Court then expressed concern that such a vague standard would allow judges too much discretion. *Id.* at 67–68, 124 S.Ct. 1354. Based upon this concern, the Court proceeded to abrogate part of its holding in *Roberts* by establishing new standards for the admission of a declarant's out-of-court statements when those statements are offered against a criminal defendant. When doing so, the Court first explained the concept of "testimonial statements" for purposes of the Confrontation Clause. The Court explicitly rejected the notion that the Clause applies only to in-court testimony and established that it may apply to some out-of-court statements as well. *Id.* at 50–51, 124 S.Ct. 1354. The Court stated that the Clause "applies to 'witnesses' against the accused—in other words, those who 'bear testimony'" and that "'testimony,' in turn, is typically '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.'" *Id.* at 51, 124 S.Ct. 1354 (quoting 1 N. Webster, An American Dictionary of the English Language (1828)).

The Supreme Court then gave some context to testimonial statements when it stated that "an accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." *Id.* at 51, 124 S.Ct. 1354. The Court held that when the out-of-court statements are testimonial in nature, two conditions must be satisfied: (1) the declarant must be unavailable, and (2) the defendant must have had a prior opportunity to cross-examine the declarant. *Id.* at 68, 124 S.Ct. 1354. But, when nontestimonial hearsay is at issue, states are permitted to exempt such statements from Confrontation Clause scrutiny as they see fit. *Id.* at 68, 124 S.Ct. 1354.

While the Supreme Court in *Crawford* established a bright-line test governing the admissibility of testimonial statements, it declined to comprehensively define the types of statements that are to be considered testimonial. *Id.* at 68, 124 S.Ct. 1354. The Court did, however, identify the following three "formulations of [the] core class of 'testimonial' statements":

[ (1)] *[E]x parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially; [ (2)] extrajudicial statements … contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; [ (3)] statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.

*Id.* at 51–52, 124 S.Ct. 1354 (citations omitted).[2]

The Supreme Court then cautioned that "involvement of government officers in the production of testimony with an eye toward trial presents unique potential for prosecutorial abuse." *Id.* at 56 n. 7, 124 S.Ct. 1354. After noting that there are various definitions of the term "interrogation," the Court explained that the term is to be used in a colloquial, rather than technical legal, sense for purposes of a Confrontation Clause analysis. *Id.* at 53 n. 4, 124 S.Ct. 1354.[3] The Court then established a category of statements that are always testimonial, which includes "interrogations by law enforcement officers" and prior testimony at a preliminary hearing, before a grand jury, or at a previous trial. *Id.* at 68, 124 S.Ct. 1354. As for all other types of statements, the Court elected to "leave for another day" the determination of whether such statements should be deemed testimonial, explaining that, despite the uncertainty that the holding may bring, "it can hardly be any worse than the status quo." *Id.* at 68 n. 10, 124 S.Ct. 1354.

Post-*Crawford,* we have not defined the parameters of what constitutes "testimonial" statements. *See State v. Martin,* 695 N.W.2d 578 (Minn.2005) (stating that "this court must also 'leave for another day' any effort to discern the Supreme Court's meaning of 'testimonial' " because a determination as to whether the declarant's statement was testimonial was unnecessary to resolving the case); *State v. Burrell,* 697 N.W.2d 579, 584 (Minn.2005) (directing district court on remand to "weigh all relevant factors" when determining whether police station interview of nonsuspect was testimonial). Only a few courts have implied that all three of the Supreme Court's formulations should be used. *See, e.g., United States v. Saget,* 377 F.3d 223, 228–29 (2nd Cir.2004); *United States v. Arnold,* 410 F.3d 895, 902 (6th Cir.2005).

Applying the holding in *Crawford,* we now examine whether the statements R.R. and her sister made during the 911 call and to the police are admissible as evidence. We begin our analysis with the 911 call. While there are a variety of reasons a person may call 911, we focus in this case specifically on those callers seeking protection from immediate danger. Some courts have concluded that statements made by a person seeking protection from immediate danger which also report a crime are categorically nontestimonial.[4] A few courts have reached the opposite conclusion, determining that statements made during 911 calls reporting crimes—even if the

---

**2.** Other courts and legal commentators have agreed that the Supreme Court's third formulation is also the "broadest" formulation, because more out-of-court statements would be characterized as testimonial under that formulation than under the other two formulations. *See, e.g.,* Andrew King–Ries, *Crawford v. Washington: The End of Victimless Prosecution?* 28 Seattle U.L.Rev. 301, 318 (2005); Robert P. Mosteller, *Crawford v. Washington: Encouraging and Ensuring the Confrontation of Witnesses,* 39 U. Rich. L.Rev. 511, 527–29 (2005); *United States v. Cromer,* 389 F.3d 662, 673 (2004); *U.S. v. Savoca,* 335 F.Supp.2d 385, 392 (2004). In his concurrence in *Crawford,* Chief Justice Rehnquist also appears to characterize the third formulation as the broadest. *See Crawford,* 541 U.S. at 71, 124 S.Ct. 1354 (Rehnquist, C.J., concurring).

**3.** *See* American Heritage Dictionary of the English Language 944 (3rd ed.1992) (defining "interrogate" as "to examine by questioning formally or officially").

**4.** *See People v. Moscat,* 3 Misc.3d 739, 777 N.Y.S.2d 875, 880 (N.Y.Crim.Ct.2004); *State v. Anderson,* 2005 WL 171441 at *4 (Tenn. Crim.App. Jan. 27, 2005) (unpubl.); *Byrd,* 160 Ohio App.3d 538, 828 N.E.2d 133, 2005 WL 937737 at *3; *Commonwealth v. Gray,* 867 A.2d 560, 567 (Pa.Super.Ct.2005).

caller is in peril—are categorically testimonial and as such must be excluded from evidence. *See People v. Cortes*, 4 Misc.3d 575, 595, 781 N.Y.S.2d 401 (N.Y.Sup.Ct. 2004); *Arnold*, 410 F.3d at 900–01.

Wright urges us to follow the approach articulated in *Cortes*, and he asserts that a person who calls 911 to seek protection from immediate danger is expressly aware that she has "formally initiat[ed] the criminal process" and that the statements she makes during the call may later be used at trial. But we find this broad assertion unpersuasive. It is doubtful that in the face of immediate danger a caller is contemplating how her statements might later be used at a trial. In asking the caller questions, the 911 operator seeks to ascertain the nature of the caller's peril and provide an appropriate response. The operator's primary goal is not to conduct an investigation in anticipation of future prosecution of a wrongdoer. Generally speaking, even under the third formulation suggested by the Supreme Court, it would be an exceptional occasion when a statement made by a caller during the course of a 911 call would be classified as testimonial. Nevertheless, we are not persuaded by the state's assertion that the admissibility of all statements made during 911 calls remains unaffected by *Crawford*.

■ Most courts that have directly addressed this issue have elected to analyze the circumstances of a given 911 call on a case-by-case basis in order to reach a conclusion about whether the statements made during that call are testimonial or nontestimonial. After engaging in this type of analysis, the great majority of

these courts have reached the conclusion that such statements are nontestimonial.[5] A few courts have reached the opposite conclusion.[6] We agree with the former approach. We conclude that it is appropriate to evaluate whether statements made during 911 calls are testimonial in light of the circumstances under which the calls are made. Accordingly, we decline to adopt a categorical rule that all statements made during 911 calls are nontestimonial.

■ Here, R.R. called 911 shortly after Wright left the apartment, and the call ended immediately after the 911 operator confirmed that Wright had been apprehended. The district court observed that R.R. and her sister were both "trembling, stuttering, crying, [and] hyperventilating" during the call and begging for help. During the call, the operator focused only on obtaining information for an immediate intervention rather than a future prosecution, and attempted to calm R.R. and her sister by assuring them that they would be safe. Given the demeanor of the victims, the temporal proximity to the incident, and the nature of the dialogue between the victims and the 911 operator, we conclude that statements made during the 911 call were nontestimonial. Therefore, we hold that the admission of the statements made by R.R. and her sister during the 911 call did not violate Wright's Confrontation Clause rights under *Crawford*.

## II.

We now turn to the more difficult *Crawford* question—the admissibility of the statements R.R. and her sister made to the police officers who conducted the ini-

**5.** *See, e.g., People v. Corella*, 122 Cal.App.4th 461, 18 Cal.Rptr.3d 770, 776 (2004); *Leavitt v. Arave*, 383 F.3d 809, 830 n. 22 (9th Cir. 2004); *People v. Conyers*, 4 Misc.3d 346, 777 N.Y.S.2d 274, 276–77 (N.Y.Sup.Ct.2004); *Coleman*, 791 N.Y.S.2d at 114.

**6.** *See State v. Powers*, 124 Wash.App. 92, 99 P.3d 1262, 1266 (2004); *Isaac*, 2004 WL 1389219 at *5.

tial, on-scene field investigation. Wright argues that these statements are testimonial, and thus their admission violated his rights under *Crawford.*

After *Crawford,* several courts have addressed the admissibility of statements made during field investigations, but there has been little consensus as to whether the statements are testimonial. One California Court of Appeals panel has determined that statements made during preliminary field investigations at a crime scene are categorically nontestimonial. *See People v. Corella,* 122 Cal.App.4th 461, 18 Cal. Rptr.3d 770, 776 (2004). Both the Sixth Circuit and Georgia's Supreme Court, on the other hand, have deemed statements made during field investigations to be testimonial. *See Moody v. State,* 277 Ga. 676, 594 S.E.2d 350, 354 n. 6 (2004); *Arnold,* 410 F.3d at 904. The overwhelming majority of courts do not use a categorical approach to determining the admissibility of these statements; rather, they determine whether the statements are admissible by examining, on a case-by-case basis, the circumstances under which each statement is made. Using this approach, most of those courts have concluded that, depending on the circumstances, certain statements produced during a field investigation may be nontestimonial.[7]

■■■■ Consistent with these courts and our approach to analyzing statements made during 911 calls, we conclude that statements made to the police during a field investigation should be analyzed on a case-by-case basis according to the circumstances under which the statements are made. As previously noted, the Supreme Court declined to comprehensively define the types of statements that are considered testimonial, but the court did establish certain parameters when it articulated three possible formulations of the core class of testimonial statements. Because the Supreme Court did not provide a comprehensive definition of "testimonial," a review of post-*Crawford* decisions of other courts exploring the nuances of testimonial statements in the context of field examinations is helpful. Our review of these decisions reveals that these courts commonly take into account several considerations. *See* n. 7, supra. These considerations include: (1) whether the declarant was a victim or an observer; (2) the declarant's purpose in speaking with the officer (e.g., to obtain assistance); (3) whether it was the police or the declarant who initiated the conversation; (4) the location where the statements were made (e.g., the declarant's home, a squad car, or the police station); (5) the declarant's emotional state when the statements were made; (6) the level of formality and structure of the conversation between the officer and declarant; (7) the officers' purpose in speak-

---

7. *See, e.g., Hammon v. State,* 829 N.E.2d 444, 455 (Ind.2005); *People v. King,* — P.3d —, 2005 WL 170727 at *5 (Colo.Ct.App. Jan.27, 2005); *Forrest,* 596 S.E.2d at 27–28; *People v. Mackey,* 5 Misc.3d 709, 785 N.Y.S.2d 870, 873–74 (N.Y.Crim.Ct.2004); *West,* 291 Ill. Dec. 72, 823 N.E.2d at 88–89; *Wilson v. State,* 151 S.W.3d 694, 698 (Tex.Ct.App.2004); *Key v. State,* — S.W.3d —, 2005 WL 467167 at *4 (Tex.Ct.App. Feb. 28, 2005); *Davis,* 2005 WL 183141 at *4; *United States v. Webb,* 2004 WL 2726100 at *3–4 (D.C. Nov. 9, 2004) (unpub.); *Gonzalez v. State,* 155 S.W.3d 603, 609 n. 4 (Tex.Ct.App.2004); *State v. Maclin,* 2005 WL 313977 at *17 (Tenn. Crim.App. Feb.9, 2005) (unpub.); *State v. Mason,* 110 P.3d 245, 250, 251 (Wash.Ct.App., 2005); *Spencer v. State,* 162 S.W.3d 877, 882–83 (Tex.Ct.App.2005); *People v. Watson,* 5 Misc.3d 1013, 798 N.Y.S.2d 712, 2004 WL 2567124 at *14–15 (N.Y.Sup.Ct.2004) (unpub.). *But see Byrd,* 160 Ohio App.3d 538, 828 N.E.2d 133, 137 (2005); *Lopez v. State,* 888 So.2d 693, 699–700 (Fla.Ct.App.2004); *Drayton v. United States,* 877 A.2d 145, 2005 WL 1413862 at *5 (D.C., June 16, 2005); *People v. Victors,* 353 Ill.App.3d 801, 289 Ill. Dec. 154, 819 N.E.2d 311 (2004).

ing with the declarant (e.g., to secure the scene, determine what happened, or collect evidence); and (8) if and how the statements were recorded. *Id.* We agree that these considerations are useful in determining whether a statement is testimonial or nontestimonial. Nevertheless, while this list is extensive, we note that other considerations also may prove useful.

■ On balance, the first five considerations listed above weigh in favor of a conclusion that the statements R.R. and her sister made to the police during the field investigation are nontestimonial. Both R.R. and her sister were victims, not mere observers. They initiated contact with the police by dialing 911 and, by contacting the police, they sought protection from Wright. They allowed the police into the apartment immediately following the incident in order to talk about the incident. When Officers Weeks and Lewis arrived at the apartment, they observed that R.R. and her sister were emotionally distraught and they remained that way throughout the entire conversation. The district court agreed with the officers' assessment of the condition in which they found R.R. and her sister.

The sixth and seventh considerations— the level of formality and the structure of the questioning, and the officers' purpose in speaking with the declarants—are not easily resolved. Wright urges us to conclude that these factors weigh in his favor. Wright argues that the officers' interviews constituted formal police interrogations because the police sought to obtain formal statements from R.R. and her sister, who ultimately "bore witness" against him. Wright emphasizes that the interviews took place about half an hour after the incident, the officers took notes and testified at *Rasmussen* hearings from those notes, and the officers said that the information provided was sufficient to support a

lawful arrest. Wright asserts that the officers questioned R.R. and her sister "in a structured manner designed to elicit the information the officers knew would be necessary for a conviction."

Wright implies that the officers' interviews of R.R. and her sister are similar to the questioning of the defendant's wife in *Crawford.* We disagree. The circumstances under which the interviews were conducted in each case are distinguishable. In *Crawford,* the police already had arrested the man they suspected of committing the crime. 541 U.S. at 38, 124 S.Ct. 1354. Both the suspect and his wife were in custody at the police station when they were interrogated. *Id.* The nature of the questioning was adversarial because the wife was a potential suspect rather than a victim. Most significantly, the police had given both the man and his wife *Miranda* warnings before the wife made the statements. *Id.*

Here, the police interviews were nearly contemporaneous with the incident and Wright's arrest. The questioning was not adversarial; R.R. and her sister were the victims, and the officers traveled to R.R.'s apartment in response to her call for assistance. The state observes, and we agree, that it is relevant that the officers lacked specific details of the offense and that the officers were engaging in preliminary fact-gathering to determine whether there was cause to detain Wright. It is inconsequential that during the interviews the officers took notes that they later used to refresh their memories at trial. We acknowledge that the officers took possession of some evidence at the apartment while interviewing R.R. and her sister, and Wright was in custody at that time. However, we conclude that the officers' actions represent a response to a call for assistance and preliminary determination of "what happened" and whether there was immediate

danger, rather than an effort to gather evidence for a future trial.

Ultimately, when determining the parameters of testimonial statements, we look for guidance to the three possible formulations that the Supreme Court identified in *Crawford*, 541 U.S. at 51–52, 124 S.Ct. 1354. Under the Court's first two formulations, it is clear that the statements R.R. and her sister gave to the officers are nontestimonial. The statements were not contained in formalized testimonial materials, nor could they be considered ex parte in-court testimony or its functional equivalent. A reasonable person under such circumstances probably would not make statements in contemplation of a trial. Indeed, the facts indicate that both R.R. and her sister were primarily concerned about Wright's ability to harm them in the future, and not with the criminal penalties that he might face for his actions that night.

In our analysis, consideration of the Supreme Court's third formulation of testimonial statements gives us some pause because a reasonable citizen interacting with a police officer likely would recognize that there is a chance that any statement she makes during that interaction may later be used at a trial. A consequence of using the Court's broadest formulation may be the categorization of virtually every out-of-court statement made by a declarant to a police officer as testimonial. But such a consequence would make an analysis of the interrogative qualities of interactions between declarants and the police wholly unnecessary. This does not appear to be the Court's intended result based on the facts of *Crawford* and the Court's analysis.

The Supreme Court stated in *Crawford* that it would "leave for another day" any effort to put forth a comprehensive definition of testimonial statements. 541 U.S. at 68, 124 S.Ct. 1354. We believe that the task of defining the exact parameters of what constitutes testimonial statements for purposes of the Confrontation Clause of the U.S. Constitution is best suited for the Supreme Court. With regard to certain types of statements, the Court has already spoken; but statements made in other contexts are best analyzed in terms of the particular facts and circumstances under which they are made in order to determine their testimonial or nontestimonial nature. Having analyzed the facts and circumstances of the field investigation in this case, we conclude that the statements that R.R. and her sister made to the officers during their field investigation are nontestimonial. Accordingly, we hold that the admission of these statements at trial did not violate Wright's Confrontation Clause rights under *Crawford*.

■ At this point, it is appropriate to note that cases involving domestic violence, such as the case before us today, present special concerns. We agree with amici curiae that perpetrators of domestic violence frequently intimidate their victims with the goal of preventing those victims from testifying against them. Thus, a forfeiture by wrongdoing analysis is particularly suitable for cases involving domestic violence. In *Crawford*, the Supreme Court explicitly preserved the rule of forfeiture by wrongdoing—the ability of a court to admit evidence after the state has shown that a defendant forfeited his right to confront a witness by procuring the witness's unavailability. 541 U.S. at 62, 124 S.Ct. 1354. This rule has been consistently applied by Minnesota courts. *See, e.g., State v. Fields*, 679 N.W.2d 341, 347 (Minn.2004); *State v. Byers*, 570 N.W.2d 487, 495 (Minn. 1997); *State v. Peirce*, 364 N.W.2d 801, 807–08 (Minn.1985); *State v. Olson*, 291 N.W.2d 203, 207–08 (Minn.1980). In Minnesota, a defendant will be found to

have forfeited by his own wrongdoing his right to confront a witness against him if the state proves that the defendant engaged in wrongful conduct, that he intended to procure the witness's unavailability, and that the wrongful conduct actually did procure the witness's unavailability. *See Fields*, 679 N.W.2d at 347.

Although we preserve the availability of a forfeiture by wrongdoing analysis after *Crawford*, we decline to consider it in this case for two reasons. First, the district court did not engage in factfinding or issue conclusions regarding whether Wright procured the unavailability of R.R. or her sister. A forfeiture by wrongdoing analysis was unnecessary at the time of Wright's trial because the Supreme Court had not yet issued its decision in *Crawford*.[8] We recognize, however, that this analysis may be appropriate in future cases when a defendant seeks to exclude an out-of-court statement from use at his trial on the basis that the statement is testimonial. Second, and more importantly, our holding that all of the statements that R.R. and her sister made during the 911 call and to the officers at the apartment during the officers' field investigation are nontestimonial obviates a forfeiture by wrongdoing analysis.

Affirmed.

---

**8.** The Supreme Court issued its decision in *Crawford* on March 8, 2004. A jury found Wright guilty on May 6, 2003.