**STATE of Minnesota, Appellant,**

v.

**Edward Richard KRASKY, Respondent.**

**No. A04–2011.**

Court of Appeals of Minnesota.

Oct. 3, 2006.

Mike Hatch, Attorney General, St. Paul, MN; and Boyd Beccue, Kandiyohi County Attorney, C.J. Crowell, Assistant County Attorney, Willmar, MN, for appellant.

Mary M. McMahon, McMahon & Associates Criminal Defense, Ltd., Roseville, MN, for respondent.

Considered and decided by WILLIS, Presiding Judge, STONEBURNER, Judge, and CRIPPEN, Judge.

## OPINION

CRIPPEN, Judge.*

This appeal from a pretrial order excluding evidence is before this court on remand from the supreme court. *State v. Krasky,* 696 N.W.2d 816 (Minn.App.2005), *review granted* (Minn. Aug. 16, 2005), *remanded* (Minn. May 16, 2006). The district court excluded prosecution evidence of the child-victim's statement to a nurse practitioner, concluding that it was testimonial evidence that would violate the Confrontation Clause under *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). On this remand, which follows two recent Minnesota Supreme Court decisions on the admissibility of such statements, we must decide whether the child's statement was testimonial when it occurred as part of a police investigation approximately two years after the suspected sexual abuse, after the suspect's parental rights had been terminated, and two months after the child had been placed in foster care. We affirm the district court's exclusion of the evidence.

## FACTS

In April 2004, then-six-year-old T.L.K. and her then-four-year-old sister, M.R.K., were living with their foster parents. Their foster mother suspected T.L.K. of inappropriately touching M.R.K. and asked T.L.K. if anyone had ever touched her that way. T.L.K. responded by describing acts suggesting that her father, respondent Edward Krasky, had inappropriately touched both her and M.R.K. A few days later,

Houston walked in on T.L.K. intimately kissing M.R.K., apparently against M.R.K.'s will. These incidents, as well as a previous comment by T.L.K. that Krasky had licked her "all over," prompted Houston to contact the authorities.

On May 12, 2004, the Willmar Police Department received a child-protection report regarding T.L.K. and Krasky. The report indicated that the sexual abuse had occurred on multiple occasions and involved both T.L.K. and her sister. The parental rights of both Krasky and his wife had been terminated some time before the report was received. The termination of parental rights appears to have been based, at least in part, on Krasky's physical assault of T.L.K. in July 2001, for which he was convicted of domestic assault, and his assault against his four-month-old son in November 2002, for which he was convicted of second-degree assault.

Detective Timothy Manuel and Charlotte Hand, the child-protection worker assigned to the case, decided to have T.L.K. interviewed at Midwest Children's Resource Center (MCRC). On May 20, 2004, a nurse practitioner at MCRC interviewed and examined T.L.K. The interview was monitored from another room by Charlotte Hand. Hand's affidavit states that she and an adoption social worker observed the examination from the observation room, and the district court made a finding to that effect. It appears that Detective Manuel was not in the observation room but watched the interview on videotape later.

During the interview, T.L.K. had difficulty focusing and gave disjointed answers that were difficult to understand; she was

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to        Minn. Const. art. VI, § 10.

able to provide more direct answers in the subsequent physical examination. In both the interview and the examination, T.L.K. described several occasions when Krasky touched her with his fingers, tongue, and penis.

Shortly after a record of the interview was delivered to Detective Manuel, Krasky was charged with six counts of first-degree criminal sexual conduct, in violation of Minn.Stat. § 609.342 (2002), and six counts of second-degree criminal sexual conduct, in violation of Minn.Stat. § 609.343 (2002). After a pretrial hearing on Krasky's motions to suppress the state's evidence, the district court ruled that T.L.K.'s statements in the interview and examination were testimonial and therefore inadmissible under *Crawford*. The district court also ruled that the state's *Spreigl* evidence was inadmissible.

The state appealed from the district court's order suppressing both T.L.K.'s statements at MCRC and the *Spreigl* evidence. On May 24, 2005, this court reversed the suppression of T.L.K.'s examination statements and affirmed the suppression of the state's *Spreigl* evidence. *State v. Krasky*, 696 N.W.2d 816, 820–21 (Minn.App.2005). Krasky filed a petition for review with the Minnesota Supreme Court, and on May 16, 2006, the supreme court remanded the case to this court. *Id., review granted* (Minn. Aug 16, 2005), & *remanded* (Minn. May 16, 2006). It vacated section I of this court's May 24, 2005 opinion, with instructions to reconsider the *Crawford* issue in light of the supreme court's opinions in *State v. Bobadilla*, 709 N.W.2d 243 (Minn.2006), and *State v. Scacchetti*, 711 N.W.2d 508 (Minn.2006).

Both *Bobadilla* and *Scacchetti* determine whether statements made by three-year-old victims of sexual abuse are testi-monial by considering factors articulated in *State v. Wright*, 701 N.W.2d 802, 812–13 (Minn.2005), and applying the overall principle that a "substantial purpose" of the testimonial statement is "producing evidence for trial." *Bobadilla*, 709 N.W.2d at 252; *see Scacchetti*, 711 N.W.2d at 513. But after this case was remanded, *Wright* was vacated by the United States Supreme Court and remanded for reconsideration in light of *Davis v. Washington*, —— U.S. ——, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). *Wright v. Minnesota*, —— U.S. ——, 126 S.Ct. 2979, —— L.Ed.2d —— (2006). In *Davis*, the Supreme Court held that statements made in the course of police interrogation are testimonial, and thus may violate the Confrontation Clause, when the "primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." 126 S.Ct. at 2274 (footnote omitted). We must consider the application of *Bobadilla* and *Scacchetti* to this case in light of the Supreme Court's opinion in *Davis*.

## ISSUE

Did the district court err in ruling that evidence of T.L.K.'s statements during the interview and examination at MCRC is inadmissible?

## ANALYSIS

■ On appeal from a pretrial order suppressing evidence, the state "must clearly and unequivocally show both that the trial court's order will have a 'critical impact' on the state's ability to prosecute the defendant successfully and that the order constituted error." *State v. Scott*, 584 N.W.2d 412, 416 (Minn.1998) (quotation omitted). As we determined in our earlier opinion, the state has shown critical impact. *Krasky*, 696 N.W.2d at 818. Whether the district court erred by sup-

pressing T.L.K.'s statements at MCRC is a question of law, which we review de novo. *Id.*

## I. *Scacchetti & Bobadilla*

In *Scacchetti*, the supreme court held that a statement made by a three-year-old girl to a pediatric nurse practitioner at MCRC was not testimonial and was therefore admissible as against a Confrontation Clause challenge. 711 N.W.2d at 510. *Scacchetti* involved a mother who suspected her boyfriend of sexually abusing her three-year-old daughter. *Id.* at 510–11. The mother went to a women's shelter, where she was encouraged to take the daughter to the hospital. *Id.* at 511. At the hospital, concern of sexual abuse prompted assessment of the daughter at the hospital by a MCRC pediatric nurse practitioner, and a follow-up assessment at MCRC, where the daughter was again interviewed and examined. *Id.* at 511–12.

The *Scacchetti* court held that the MCRC nurse practitioner was not a government actor and that because the police did not arrange and were not present during the interview, the nurse practitioner was not acting in concert with the government. *Id.* at 514. Because the interviewer was neither a government actor nor "acting in concert with" the government, the supreme court held that the daughter's statements were not testimonial. *Id.* at 514–15.[1] But it noted that even if the

nurse practitioner were acting in concert with the government, the statements would not be testimonial because the nurse practitioner's purpose was to assess the daughter's medical condition, "to determine whether the child has been abused and, if necessary, to connect the child and family to appropriate services." *Id.* at 515.

Here, the nurse practitioner who interviewed T.L.K. did so at the request of the child protection worker and the investigating officer, Detective Manuel. These two "government officers" had determined that the interview was "the best way to proceed with the investigation." The child protection worker monitored the interview, a videotape was provided to Detective Manuel who reviewed it shortly thereafter, and the prosecution followed almost immediately. We conclude that the nurse practitioner was at least "acting in concert with" the government in conducting the interview. There was no identified medical reason for the interview, and there was no imminent threat to the safety or welfare of T.L.K., who had been in foster care for two months.

In *Bobadilla*, the Minnesota Supreme Court held that statements made by a three-year-old victim of sexual abuse to a child-protection worker were not testimonial, despite inquiries regarding what wrongdoing had occurred and police involvement in arranging the interview—

1. The supreme court quoted *Crawford's* statement that "[i]nvolvement of government officers in the production of testimony with an eye toward trial presents unique potential for prosecutorial abuse." *Scacchetti*, 711 N.W.2d at 514 (quoting *Crawford*, 541 U.S. at 56 n. 7, 124 S.Ct. at 1367 n. 7) (emphasis added). The court stated that "the fact that the questioner is a government officer is probative of the questioner's purpose for eliciting the statements[.]" *Id.* The Supreme Court in *Crawford*, in turn, had focused on "government officers," not solely police officers, as

those who, in eliciting "formal statement[s]," obtain "testimony." 541 U.S. at 51, 124 S.Ct. at 1364. The Court expressed its concern for those who performed "investigative functions," *id.* at 53, 124 S.Ct. at 1365, who produced testimony "with an eye toward trial," *id.* at 57 n. 7, 124 S.Ct. at 1367 n. 7, and the court disparaged the notion that "*ex parte* testimony could be admitted against a criminal defendant because it was elicited by 'neutral' government officers." *Id.* at 66, 124 S.Ct. at 1373.

that neither the child-protection worker nor the three-year-old victim was acting to preserve testimony for trial. 709 N.W.2d at 255–56. The child-protection worker interviewed the victim at a police station five days after the victim's mother brought him to the emergency room on suspicion that the child recently had been sexually abused. *Id.* at 246–47. The supreme court noted that producing evidence for trial must be at least a substantial purpose of the statement and that "[i]f part of the purpose of this interview was to produce a statement for use at a future trial, such a purpose was at best incidental to the main purpose: assessing and responding to imminent risks to [the victim's] health and welfare." *Id.* at 254–55.

This case is distinguishable from *Bobadilla.* At the time T.L.K. was brought to MCRC for the interview, the events under investigation were at least two years old, and T.L.K. had been removed from Krasky's home. There is no evidence of any ongoing concern, arising from the past abuse, for the child's safety or welfare. This case is a police investigation of a crime, without evidence that the interview was prompted or affected by a medical or protective aim.

## II. *Davis*

Although the supreme court remanded this appeal for reconsideration in light of *Scacchetti* and *Bobadilla,* the United States Supreme Court has since further shaped the law of the case, elaborating on *Crawford,* in another seminal Confrontation Clause opinion. *Davis v. Washington,* — U.S. ——, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). The *Davis* opinion affects the analysis of both *Scacchetti* and *Bobadilla.* Enlarging its impact, we also note that the Supreme Court has remanded for reconsideration in light of *Davis* our supreme court's decision in *Wright,* which set out the analysis relied on in both *Scacchetti*

and *Bobadilla.* 701 N.W.2d 802 (Minn. 2005), *remanded,* —— U.S. ——, 126 S.Ct. 2979, —— L.Ed.2d —— (2006).

### A. *Davis & Wright*

The supreme court in *Wright* determined that statements made to police by a domestic-violence victim and her sister in a field investigation shortly after the offense were non-testimonial. 701 N.W.2d at 814. The court held that such statements should be analyzed on a case-by-case basis taking into account eight considerations. *Id.* at 812. The court expressed concern that *Crawford* might be read to categorize "virtually every out-of-court statement made by a declarant to a police officer as testimonial." *Id.* at 814. The court expressed instead its preference for "an analysis of the interrogative qualities of interactions between declarants and the police." *Id.*

The United States Supreme Court in *Davis* held that a statement taken from a suspected domestic-violence victim, in circumstances resembling those in *Wright,* was testimonial. *See Davis,* 126 S.Ct. at 2278–79. Although the facts of *Wright* may well be distinguishable, application of the *Davis* analysis to those facts leads in a direction that differs from the approach taken in *Wright.* Instead of broadly analyzing the circumstances surrounding the statement, the *Davis* Court acted on the observation simply that the police officer was eliciting facts about "what happened" or "how potentially criminal past events began and progressed." *Id.* at 2278. The Court did not inquire into the purpose of the declarant in answering the police officer's questions but merely noted that the questioning "took place some time after the events described were over" and that there "was no emergency in progress." *Id.*

Both *Scacchetti* and *Bobadilla* cite *Wright's* list of eight relevant considerations and study competing interview purposes. *Scacchetti,* 711 N.W.2d at 513–15; *Bobadilla,* 709 N.W.2d at 250–55. Neither opinion reflects the more direct approach of *Davis,* which examines only whether police are seeking information about past events that may relate to a future prosecution and that is not sought for a purpose of rendering emergency assistance. *See Davis,* 126 S.Ct. at 2273–74 (holding that statements in response to police interrogation are "testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution") (footnote omitted). Thus, we must assess the impact of *Davis* on both *Scacchetti* and *Bobadilla,* and on the reconsideration of this appeal.

## B. *Davis & Bobadilla*

In *Bobadilla,* the supreme court, after citing the eight considerations listed in *Wright,* noted that the declarant's purpose in speaking and the government officer's purpose in questioning were "the central considerations." 709 N.W.2d at 250. The court examined the government questioner's prospective aims and, drawing from *Wright* and *Crawford,* considered that the purpose of producing evidence for a later trial was determinative only if this explained the interview "to a substantial degree." *Id.* at 252. But in *Davis,* singularly looking at aims of the government questioner when examining the "purpose of the interrogation," 126 S.Ct. at 2274, the court narrowly examines the fact that the interview was "part of an investigation into possibly criminal conduct" and the police officer was seeking to determine "what happened." *Id.* at 2278.

*Davis* makes evident, when the government questioning concerns past events potentially relevant to later criminal prosecution, that there is no occasion for a broad inquiry into competing possible future uses of the information other than prosecution. As long as the information is not needed to make an immediate decision, evident when attempting to meet an ongoing emergency, the primary purpose of the interrogation is investigative. The difference is one between finding out "what is happening," as in the case of an emergency, and finding out "what happened," which occurs in the course of any investigation. *See id.*

This characterization of purposes, either immediate or investigative, is uncomplicated—"a much easier task." *Id.* In the circumstances of *Davis,* even though the interview occurred shortly after the offense and at the same site, the court found it "entirely clear" from the circumstances that this was an investigation into possibly criminal past conduct, an inquiry into "what happened." *Id.* And there is no suggestion in *Davis* that the court should inquire into the declarant's state of mind or her purpose in speaking with police, if, as the record makes clear in the immediate case, the declarant was interviewed "as the best way to proceed with the investigation."

■ *Davis* makes more evident what *Crawford* may have left uncertain, that the Confrontation Clause is implicated when government officers, engaged in an investigation aimed at learning what happened in the past, ask questions with full awareness that the inquiry is likely to produce evidence of past criminal conduct. *Davis* would appear to preclude such an inquiry when the witness's statement was, as T.L.K.'s statement was here, "a weaker substitute for live testimony." *Id.* at 2277 (quoting *United States v. Inadi,* 475 U.S.

387, 394, 106 S.Ct. 1121, 1126, 89 L.Ed.2d 390 (1986)).

The *Davis* Court also noted the significance of the level of formality prevailing in a government officer's interview. *Id.* at 2276–77. *Davis* considered a statement "formal enough" for purposes of the Confrontation Clause when the witness was separated from the suspected offender, "some time" had elapsed since the events she described, and she "deliberately recounted" facts in response to official interrogation. *Id.* at 2278. In those circumstances, which accurately describe T.L.K.'s interview at MCRC, there is no room for inquiry into what other non-investigative and non-prosecutorial uses the government officials may in the future have had for the statement.

In *Bobadilla* the supreme court held that a statement made by a three-year-old child to a child protection worker in a "risk assessment interview" was not testimonial. 709 N.W.2d at 256–57. The court recognized a child-protection purpose despite evidence that the interview was conducted at the law enforcement center, under the observation of a police officer, after the police investigation had begun, and after the occurrence of abuse had been confirmed by a hospital physician. 709 N.W.2d at 246–47, 255.

■ The *Bobadilla* court noted the statutory scheme for child-abuse reporting, the purpose of which is "to protect the health and welfare of children." *Id.* at 254–55 (citing Minnesota's statutory scheme for reporting, investigation, and responding to threats to children's health and welfare, Minn.Stat. § 626.556 (2004)). Under the analysis presented in *Davis*, the statutory policy for a mandatory "investigation" of child-abuse reports takes on added importance. It becomes significant that the statute requires the coordination of investigative efforts with police authori-

ties, the taking of a single statement in a joint effort of police and other responsible agencies, and the preservation of a record of the child's statements. Minn.Stat. § 626.556, subd. 1.

In addition, in light of the analysis in *Davis*, the non-criminal purpose inherent in child-abuse reporting is not significant to the Confrontation Clause analysis when the child's health and welfare are no longer at risk and the nature of the interview is an "investigation into possibly criminal past conduct," 126 S.Ct. at 2278, an investigation into past events—and the overriding purpose under *Davis*, for Confrontation Clause purposes, is to obtain evidence for a criminal prosecution.

### C. *Davis & Krasky*

This case is more heavily affected by the holding of *Davis* than *Bobadilla* or *Scacchetti*. The *Davis* Court held a statement to be testimonial when it was made to police who had responded to a report of a domestic disturbance made by the victim in the house, but sometime after she had been separated from the suspected perpetrator, her husband. *Davis*, 126 S.Ct. at 2272, 2278. *Bobadilla* involved a statement made by a suspected victim of child abuse four days after the suspected offense, alleged to have been committed by a perpetrator with whom his father, who still had visitation rights, was residing. 709 N.W.2d at 246. In this case, T.L.K. had been removed from Krasky's home, Krasky's parental rights had been terminated, and the interview did not occur until eight days after police received the child-protection report. Moreover, the suspected offense was reported after T.L.K. was seen engaging in inappropriate conduct with her sister. There was no suspicion that the reported sexual abuse by Krasky was committed in the recent past. Thus, the conclusion that the MCRC interview was

"part of an investigation into possibly criminal *past* conduct," *Davis*, 126 S.Ct. at 2278 (emphasis added), is much more compelling than in *Bobadilla*.

We recognize that the United States Supreme Court in *Crawford* and *Davis* has dealt only with interviews of adults, a context in which the expectations of the declarant, as well as the mission of the government interviewer, may be relevant. But the Minnesota Supreme Court, now confirmed in *Davis*, has emphasized that the expectations of the declarant are not determinative:

> However, in *Wright* we rejected an approach that did not consider both the perspective of the government questioner and the perspective of the declarant. We do not think that an approach that makes the declarant's perspective dispositive gives adequate consideration to *Crawford's* fear of governmental abuses.

*Bobadilla*, 709 N.W.2d at 252 n. 3 (citations omitted).

We recognize also that the United States Supreme Court has not dealt with interviews by medical staff, such as the nurse practitioner in this case. But to fully consider the role of this interviewer, we must take into account that the interview was arranged by a police detective, as well as a child-protection worker, to further a criminal investigation of the child's accusation. As the police report states, these two government officers had "decided that [the MCRC interview was] the best way to proceed with the investigation." After preliminary questions regarding identifications, truth-telling, and terminology relevant to sexual acts, the nurse practitioner immediately turned T.L.K.'s attention to the topic of appellant's alleged criminal acts.

As discussed earlier, because the nurse practitioner was not a government employee, "we must determine whether [she] was

acting in concert with or as an agent of the government." *Scacchetti*, 711 N.W.2d at 514. Although medical staff will in many cases not be acting in concert with, or as agents of, the government, even in interviewing children about suspected child abuse, we have concluded that the nurse practitioner at MCRC was at least acting in concert with the government in this case. In *Scacchetti*, a nurse practitioner at MCRC was held not to be "acting in concert with or as an agent of the government" because police were not involved in organizing the interview and were not present during the interview, which occurred at the hospital rather than a law enforcement center. *Id.* Here, although the interview also occurred at MCRC, police organized it, the child-protection worker who coordinated it with police observed the interview, and a videotape of the interview was provided to the investigating officer, who used it to complete his offense report less than two weeks after the interview. The officer was also furnished with a written narrative summary of the interview.

The Supreme Court opinions in *Crawford* and *Davis* suggest a broad reading of the term "testimonial" statements even in this context of interviews of children conducted by medical staff. The Crawford Court expresses skepticism about the admissibility of statements "elicited by 'neutral' government officers." 541 U.S. at 66, 124 S.Ct. at 1373. Although the reference in *Crawford* was to questioning by police officers, the skepticism about government neutrality applies as strongly to private staff enlisted to investigate reports of child sexual abuse. Neither *Crawford* nor *Davis* suggests in this context that a medical professional who is acting in concert with police or child-protection workers will be sufficiently "neutral" or have a sufficiently non-investigative purpose merely

because the interview is a medical procedure.

### III. Conclusion

Based on the supreme court's opinions in *Scacchetti* and *Bobadilla,* as affected by the United States Supreme Court's recent decision in *Davis,* we determine, as the district court concluded, that T.L.K.'s interview at MCRC was testimonial in nature. It has become evident under *Crawford* and *Davis* that the Supreme Court has deliberately abandoned a prior, vague Confrontation Clause test in favor of a new approach that focuses on an uncomplicated study of the purpose of an interviewer who takes a statement that is later introduced as trial evidence.

There is, unquestionably, a unique public interest in support of criminal prosecution of child abusers.[2] But we may not, as the Supreme Court noted in *Davis,* "vitiate constitutional guarantees when they have the effect of allowing the guilty to go free." 126 S.Ct. at 2280. We must follow the rule of law and trust that innovative investigative approaches will maximize the use of civil-law remedies and forms of testimony in criminal trials that conform to the mandates of the Confrontation Clause.

We also recognize the problem of child-abuse perpetrators intimidating their young victims. But as the Supreme Court stated in *Davis,* the rule of forfeiture by wrongdoing imposes on criminal defendants "the duty to refrain from acting in ways that destroy the integrity of the criminal-trial system." *Id.* No evidence of witness coercion or intimidation is presented here. And although we recognize the state's argument that a waiver of the right

of confrontation should be found when a perpetrator selects a victim who is likely too young to testify at trial, the state cites no authority to support a doctrine of implied waiver, and we do not have the prerogative to develop such a doctrine in this case.

### DECISION

The district court did not clearly err in ruling that statements made by T.L.K. during her interview at MCRC were testimonial and therefore inadmissible as against a Confrontation Clause challenge.

**Affirmed.**

---

2. The state has not suggested that ex parte interviews of children serve their best interests in a fashion constituting cause to limit Confrontation Clause rights. Similarly, we are unable to locate any authority to establish such a doctrine. *But see Geske v. Marcolina,*

642 N.W.2d 62, 68–70 (Minn.App.2002) (holding that child's best interests in being spared a specific harm serve as a compelling state interest supporting a narrowly tailored prior restraint of speech.)