STATE of Minnesota, Appellant,

v.

Edward Richard KRASKY, Respondent.

No. A04–2011.

Supreme Court of Minnesota.

Aug. 9, 2007.

Lori Swanson, Attorney General, Kelly O'Neill Moller, Asst. Attorney General, St. Paul, MN, Boyd Beccue, Kandiyohi County Attorney, Willmar, MN, for appellant.

Mary M. McMahon, McMahon & Associates Criminal Defense, Ltd., Roseville, MN, for respondent.

Nancy A. Wiltgen, Leonard, Street and Deinard PA, Minneapolis, MN, Gail Chang Bohr, Children's Law Center of Minnesota, St. Paul, MN, for amicus curiae Children's Law Center of MN.

Alice Anna Phillips, Alexandria, VA, Victor Vieth, Winona, MN, for amicus curiae American Prosecutors Research Institute.

## OPINION

MEYER, Justice.

Appellant State of Minnesota appealed from a pretrial order barring admission of statements made to a nurse by a child victim, T.K., who was incompetent to testify at trial by reason of her young age. The court of appeals reversed, holding that admission of the statements would not violate the Confrontation Clause rights of respondent Edward Richard Krasky, and Krasky appealed. We vacated and remanded for reconsideration in light of our decisions in *State v. Bobadilla*, 709 N.W.2d 243 (Minn.), *cert. denied* —— U.S. ——, 127 S.Ct. 382, 166 L.Ed.2d 270 (2006), and *State v. Scacchetti*, 711 N.W.2d 508 (Minn. 2006), both of which dealt with application of the Confrontation Clause to statements by child victims to medical professionals. On remand, the court of appeals affirmed the district court order barring admission of T.K.'s statements. The state now brings this appeal, arguing that T.K.'s statements to a nurse are not testimonial and therefore admission of those statements poses no Confrontation Clause problem. We reverse.

On April 22, 2004, T.K.'s foster mother discovered six-year-old T.K. engaging in sexual behavior with M.K., her younger sister. When T.K.'s foster mother discussed this behavior with T.K., T.K. said that Krasky, her biological father, had engaged in various sexual behaviors with T.K. and M.K. Over the next several days, T.K. continued to engage in inappropriate behavior with her sister and again mentioned to her foster mother certain sexual behavior with Krasky.[1]

On May 12, 2004, the Willmar Police Department received a child protection report concerning T.K. (presumably made by the foster mother). Thereafter, Timothy Manuel, a detective with the Willmar Police Department, and Charlotte Hand, a social worker with Kandiyohi County Family Services who conducts child protection investigations, discussed the situation and decided to have Midwest Children's Resource Center (MCRC) interview and examine T.K.[2] On May 20, 2004, T.K.'s fos-

---

1. As of April 2004, Krasky had not had any contact with T.K. in approximately 18 months, having been incarcerated for much of that period in connection with various assault convictions stemming from physical abuse of T.K. and his other children.

2. Pursuant to a statutory scheme designed to "protect children whose health or welfare may be jeopardized through * * * sexual abuse," local social service agencies are required "to conduct a family assessment or an investigation" upon receiving a report of child sexual abuse. Minn.Stat. § 626.556 (2006), subds. 1, 10(a) (2006). A local welfare agency responsible for assessing or investigating the allegations must request information relevant to the investigation, potentially including "a

ter mother gave T.K. a ride to MCRC where they were met by Hand and Tina Mages, the girls' adoption social worker. MCRC nurse Margaret Carney first spoke to the foster mother, who described T.K.'s inappropriate behavior and the comments T.K. made regarding the sexual abuse. The foster mother also relayed some limited medical history. While Hand and Mages watched from an observation room, Carney interviewed T.K. and performed a physical examination of her. The interview and the examination were videotaped, although the physical exam was conducted out of view of the camera. Carney told T.K. that T.K. was being assessed in order to evaluate T.K.'s health and it was important for T.K. to tell the truth. During the assessment, T.K. repeatedly stated that Krasky touched her genitals, penetrated her, and made her touch his genitals. Following the assessment, Carney tested T.K. for sexually transmitted diseases and made a recommendation for psychotherapy by a therapist who specializes in children who have been sexually abused.

Krasky was charged with multiple counts of both first- and second-degree criminal sexual conduct in violation of Minn.Stat. §§ 609.342, 609.343 (2006). The state gave notice to Krasky that it intended to admit at trial T.K.'s statements to Carney or the videotape of the interview, and Krasky made a timely motion to suppress T.K.'s out-of-court statements claiming that admission of them would violate his right of confrontation. At a hearing on October 12, 2004, the prosecutor argued that Krasky had forfeited his confrontation rights by creating a violent atmosphere in the home. The state stipulated that T.K. and M.K. were not competent witnesses and were therefore unavailable to testify. The district court determined that T.K., then six years old, was incompetent to testify and therefore unavailable because T.K. "lacks the capacity to truthfully and accurately relate the facts about the defendant's alleged abuse," apparently due to her young age and developmental delays. The court concluded that T.K.'s statements during the MCRC interview and examination were testimonial and that the statements were therefore inadmissible. The court also held that Krasky did not procure T.K.'s unavailability and thereby forfeit his Sixth Amendment Confrontation Clause rights.

The state appealed from the pretrial order, and the court of appeals reversed the court's order suppressing T.K.'s statements. *State v. Krasky*, 696 N.W.2d 816, 820 (Minn.App.2005) (*Krasky I*).[3] The court held that the statements were not testimonial because they were made at least in part for medical purposes and, as a result, the court concluded that admission of the statements would not violate Krasky's rights under the Confrontation Clause. *Id.* Krasky appealed, and we granted review, stayed Krasky's appeal,

medical examination of the child." Minn. Stat. § 626.556, subd. 10(h)(3) (2006). Local social service agencies must immediately share information about child sexual abuse allegations with law enforcement, Minn.Stat. § 626.556, subd. 3(a) (2006), and law enforcement and local welfare agencies are required to "coordinate the planning and execution of their respective investigation and assessment efforts to avoid a duplication of fact-finding efforts and multiple interviews," Minn.Stat. § 626.556, subd. 10(a). Interviews of child sexual abuse complainants must be videotaped whenever possible. Minn.Stat. § 626.556, subd. 10(j)(2).

3. The state appealed the district court's decision to suppress *Spreigl* evidence, and the court of appeals affirmed the district court's decision. *Krasky I*, 696 N.W.2d at 820–21. The state did not raise the *Spreigl* issue to this court.

and ultimately remanded to the court of appeals for reconsideration in light of our decisions in *Bobadilla,* 709 N.W.2d at 243, and *Scacchetti,* 711 N.W.2d at 508.

On remand, the court of appeals considered not only the *Bobadilla* and *Scacchetti* decisions, but also *Davis v. Washington,* —— U.S. ——, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), which had been recently decided. *See State v. Krasky,* 721 N.W.2d 916 (Minn.App.2006) (*Krasky II* ). The court of appeals interpreted *Davis* as establishing that statements are testimonial when made in a nonemergency situation in response to government questions about past events that are potentially relevant to later criminal prosecution. *See id.* at 921. The court determined that T.K.'s statements were made to Carney in a nonemergency situation because T.K. had been removed from Krasky's home and his parental rights had been terminated. *See id.* at 922–23. Further, the court concluded, without explanation, that there was "no identified medical reason for the interview." *Id.* at 919. The court of appeals concluded that T.K.'s statements were testimonial and could not be admitted at trial. *Id.* at 924. Finally, the court of appeals held that, because there was no evidence of witness coercion or intimidation, Krasky had not forfeited his rights under the Confrontation Clause. *Id.* at 924. This appeal followed.

▮▮▮ The sole issue in this case is whether statements made by a child victim to a nurse at MCRC are testimonial, and therefore inadmissible under the Confrontation Clause.[4] When appealing from a pretrial order suppressing evidence, the state must establish that the order was erroneous. *State v. Scott,* 584 N.W.2d 412, 416 (Minn.1998). We employ a de novo standard of review when determining whether admission of evidence will violate a criminal defendant's rights under the Confrontation Clause. *State v. Caulfield,* 722 N.W.2d 304, 308 (Minn.2006).

▮▮▮ The Sixth Amendment states that "[i]n all criminal prosecutions the accused shall enjoy the right * * * to be confronted with the witnesses against him." U.S. Const. amend. VI; *see also* Minn. Const. art. 1, § 6 ("The accused shall enjoy the right * * * to be confronted with the witnesses against him * * *."). This clause requires that all prior testimonial statements be excluded in criminal trials unless the declarant is unavailable to testify at trial and the defendant has had a prior opportunity to cross-examine the declarant regarding the statement. *See Crawford v. Washington,* 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). The state bears the burden of proving a declarant's statements are not testimonial. *See Caulfield,* 722 N.W.2d at 308.

▮▮▮ In *Bobadilla* and *Scacchetti,* two cases decided by this court in 2006, we analyzed Confrontation Clause challenges to admission of statements by child victims. In *Bobadilla,* we examined the admissibility of statements by a child sexual abuse complainant to a child-protection worker. *See* 709 N.W.2d at 246–48. We held that the statements of a three-year-old boy were not testimonial because they were made primarily to determine whether

---

4. The dissent argues for excluding the child victim's statement for another reason—her statement is inadmissible because the judge found her to be incompetent to testify and, therefore, her statement is unreliable. A witness's competency to testify and a statement's reliability are matters that are completely separate from whether a statement is admissible under the Confrontation Clause. Neither the issue of the victim's competency nor any reliability objections are properly before the court, though presumably both issues could be raised at a later time.

abuse occurred and whether steps needed to be taken to protect the health and welfare of the complainant, not to produce a statement for trial. *See id.* at 255–56. This was true despite the fact that an initial medical examination had already been conducted several days earlier, the fact that the assessment was conducted at a law enforcement center, and the fact that a police officer was present during the interview. *Id.* at 246–47. We considered it significant that the interview of the complainant was conducted "in accord with a statutory scheme for reporting, investigating, and responding to threats to children's health or welfare" that is clearly intended to protect the health and welfare of children rather than produce statements for trial. *Id.* at 254.

In *Scacchetti*, we examined the admissibility of statements by a child sexual abuse complainant to a pediatric nurse practitioner employed by MCRC. 711 N.W.2d at 510. We held that statements by a three-and-one-half-year-old victim made during two separate assessments, which occurred several days after the alleged abuse and after an initial medical exam by a doctor, were not testimonial because they were primarily made in order to assess the complainant's medical health and because no government actor was involved in producing the statements. *See id.* at 511, 514–15.

In both cases, we looked at the specific circumstances under which the statements were made in order to determine whether they were testimonial.[5] *See Scacchetti*, 711 N.W.2d at 513–15; *Bobadilla*, 709 N.W.2d at 250–53. We focused in particular on whether production of statements for trial was a primary or merely incidental purpose from the perspectives of both the declarants and the questioners. *Scacchetti*, 711 N.W.2d at 513–15 (using terms "substantial" and "broad" rather than "primary"); *Bobadilla*, 709 N.W.2d at 250–53 (using term "substantial" rather than "primary").

In this case, the assessment of T.K. was conducted at a children's hospital rather than at a law enforcement center, and no law enforcement officer was present. The referral to MCRC was a joint decision made by social services and law enforcement, but there is no indication that the MCRC nurse who conducted the assessment of T.K. in this case was acting as a proxy for law enforcement. Accordingly, T.K.'s statements to Carney are clearly less the product of a police interrogation than the statements at issue in *Bobadilla*. As in *Scacchetti*, we conclude that a nurse practitioner employed by MCRC is not a government actor. 711 N.W.2d at 514–15.

We conclude that the primary purpose of T.K.'s statements to Carney was to assess and protect T.K.'s health and welfare. Carney conducted a physical examination of T.K., questioned the foster mother about T.K.'s medical history, tested T.K.

---

5. In both cases, we provided a list of eight nonexclusive factors that are relevant to our review:

(1) whether the declarant was a victim or an observer; (2) the declarant's purpose in speaking with the officer (e.g., to obtain assistance); (3) whether it was the police or the declarant who initiated the conversation; (4) the location where the statements were made (e.g., the declarant's home, a squad car, or the police station); (5) the declarant's emotional state when the statements were made; (6) the level of formality and structure of the conversation between the officer and declarant; (7) the officers' purpose in speaking with the declarant (e.g., to secure the scene, determine what happened, or collect evidence); and (8) if and how the statements were recorded.

*Scacchetti*, 711 N.W.2d at 513, and *Bobadilla*, 709 N.W.2d at 250 (both quoting *State v. Wright*, 701 N.W.2d 802, 812–13 (Minn.2005), *vacated and remanded*, ─── U.S. ───, 126 S.Ct. 2979, 165 L.Ed.2d 985 (2006)).

for sexually transmitted diseases, recommended that T.K. receive psychotherapy, and repeatedly told T.K. that an examination was necessary in order to ensure that T.K. was healthy. That Krasky had been incarcerated and no longer possessed parental rights at the time of Carney's assessment does not mean that T.K.'s future health and welfare were not in question. The harms of child abuse are not limited to the abused child's physical well-being. Although future acts of abuse were unlikely given that Krasky's parental rights had been terminated and he was incarcerated at the time T.K. reported the abuse, Carney's recommendation that T.K. receive psychotherapy indicates that her mental health was still at risk. Further, unlike in *Bobadilla* and *Scacchetti,* there is no indication in the record that T.K. was examined after she first reported the abuse and before meeting with Carney. Therefore, it could be said that T.K.'s current physical health remained in doubt. In addition, seeking an assessment from Carney was a natural response to T.K.'s inappropriate behavior towards other children and, following the assessment, T.K. was eventually removed from foster care and the company of the other children living there. Consequently, we conclude that T.K.'s statements to Carney were nontestimonial and that admission of those statements will not violate Krasky's rights under the Confrontation Clause.[6]

■ The statement in the police report indicating that a police officer and a child protection worker jointly concluded that "the best way to proceed with the investigation was to have [MCRC] do an inter-

view with [T.K.] along with a medical exam" does not change our conclusions. Joint decisions of this type are required by Minn.Stat. § 626.556, subd. 10a (2006). As we noted in *Bobadilla,* the purpose of that statute is not the prosecution of criminals or the collection of evidence for trial. Instead, the statute declares that

> the public policy of this state is to protect children whose health or welfare may be jeopardized through physical abuse, neglect, or sexual abuse * * *. In furtherance of this public policy, it is the intent of the legislature under this section to strengthen the family and make the home, school, and community safe for children by promoting responsible child care in all settings; and to provide, when necessary, a safe temporary or permanent home environment for physically or sexually abused or neglected children.
>
> In addition, it is the policy of this state to require the reporting of neglect, physical or sexual abuse of children in the home, school, and community settings; to provide for the voluntary reporting of abuse or neglect of children; to require a family assessment, when appropriate, as the preferred response to reports not alleging substantial child endangerment; to require an investigation when the report alleges substantial child endangerment; and to provide protective, family support, and family preservation services when needed in appropriate cases.

Minn.Stat. § 626.556, subd. 1 (2006); *see also Bobadilla,* 709 N.W.2d at 254–55

---

**6.** In both *Bobadilla* and *Scacchetti,* we noted that it was unlikely the child complainant knew that the statements could be used at trial against an abuser. *See Scacchetti,* 711 N.W.2d at 516; *Bobadilla,* 709 N.W.2d at 255. While we do not decide this case on the grounds that T.K. did not know her state-

ments might be used at trial, we note that it would be an odd outcome if we were to hold that, while T.K. is not competent to be called to the stand to give testimony in court, her out-of-court statements to Carney are nonetheless inadmissible because they are testimonial in nature.

(quoting Minn.Stat. § 626.556, subd. 1). As *Bobadilla* suggests, compliance with this statutory scheme, which is focused on protection of children's health and welfare, does not render the statements of a child sexual abuse complainant testimonial.

Krasky argues that the Supreme Court's holding in *Davis v. Washington* calls into question the validity of our holdings in *Bobadilla* and *Scacchetti* (both decided before *Davis*). Krasky's reliance on Davis is misplaced. The *Davis* case involved two separate domestic violence cases. 126 S.Ct. at 2270–73. In the first case, a 911 operator gathered information about an assailant and details of the assault. *Id.* at 2270–72. The victim never testified and the district court admitted the victim's out-of-court-statements to the 911 operator. *Id.* at 2271. In the second case, police arrived at the victim's home in response to a report of domestic abuse. *Id.* at 2272. The victim told the police that the assailant (her husband) had assaulted her and she signed an affidavit describing the assault. *Id.*

The *Davis* Court concluded that the 911 call in the first case did not produce a testimonial statement because the circumstances indicated that "its *primary purpose* was to enable police assistance to meet an ongoing emergency." *Id.* at 2277 (emphasis added). With respect to the on-scene statements in the second case, the court held that there was no emergency in progress and that the "*primary,* if not indeed the sole, *purpose* of the interrogation was to investigate a possible crime." *Id.* at 2278 (emphasis added).

■ Krasky argues that Carney was not assessing or responding to an immediate danger and, therefore, she was merely

seeking to preserve evidence for trial. We do not read the *Davis* opinion to hold that only those statements made in response to an immediate danger are nontestimonial. The facts of *Davis* required the court "to determine more precisely which police interrogations produce testimony" and the precise question was whether emergency calls to police are treated differently than statements made in the regular course of a police investigation. *Id.* at 2273–74. The court specifically noted that its holding was limited to its facts. *Id.* at 2278 n. 5 ("[O]ur holding is not an exhaustive classification of all conceivable statements—or even all conceivable statements in response to police interrogation, but rather a resolution of the cases before us and those like them." (internal quotation marks and citations omitted)). We conclude that the *Davis* decision leaves undisturbed our conclusions in *Bobadilla* and *Scacchetti* that statements elicited by a medical professional for the primary purpose of protecting a child sexual assault victim's health and welfare are nontestimonial.

■ We conclude that T.K.'s statements to Carney are nontestimonial and admission of those statements will not violate Krasky's right of confrontation under the Sixth Amendment.[7] The decision of the court of appeals is reversed.

## DISSENT

PAGE, Justice (dissenting).

I respectfully dissent, for two reasons. First, on the facts presented here, the child's statements at Midwest Children's Resource Center (MCRC) are testimonial under the Supreme Court's decision in *Davis v. Washington,* —— U.S. ——, 126

---

7. The state makes an argument in the alternative that Krasky forfeited his rights under the Confrontation Clause by creating an "atmosphere of abuse * * * in the home" through physical "assaults of his wife and all of his children." We decline to decide this question as it is not necessary to the resolution of this case.

S.Ct. 2266, 165 L.Ed.2d 224 (2006). Second, even if the child's statements at MCRC are not testimonial, they are not admissible as hearsay because they formed the basis for the district court's finding that the child was incompetent to testify. I therefore conclude that the district court properly excluded the statements.

As the court explains, the Sixth Amendment provides that "[i]n all criminal prosecutions the accused shall enjoy the right * * * to be confronted with the witnesses against him." U.S. Const. amend. VI. The Minnesota Constitution similarly provides that "[t]he accused shall enjoy the right * * * to be confronted with the witnesses against him." Minn. Const. art. 1, § 6. In *Crawford v. Washington*, the Supreme Court held that the Confrontation Clause requires that all previous testimonial statements be excluded in criminal trials unless the declarant is unavailable to testify at trial and the defendant has had an opportunity to cross-examine the declarant regarding the statement. 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). In this case, the declarant was unavailable, but the defendant had no opportunity to cross-examine the declarant regarding the statements. Therefore, the child's statements are inadmissible unless they are nontestimonial.

The Supreme Court's opinion in *Crawford* provided little help in defining what statements are "testimonial," and therefore subject to the Confrontation Clause, beyond a dictionary definition: " 'Testimony,' in turn, is typically '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.' " 541 U.S. at 51, 124 S.Ct. 1354 (quoting N.

Webster, *An American Dictionary of the English Language* (1828)). The statement at issue in *Crawford* was a tape-recorded statement given to police by Crawford's wife Sylvia describing the stabbing with which Crawford was charged. *Id.* at 38, 124 S.Ct. 1354. After listing "[v]arious formulations of this core class of 'testimonial' statements," *id.* at 51, 124 S.Ct. 1354, the Court admittedly left "for another day any effort to spell out a comprehensive definition of 'testimonial.' " *Id.* at 68, 124 S.Ct. 1354. "Whatever else the term covers," the Court continued, "it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id.* at 68, 124 S.Ct. 1354. As the Court noted, when Sylvia Crawford made the tape-recorded statement at issue, she was in police custody, "herself a potential suspect in the case." *Id.* at 65, 124 S.Ct. 1354. Under those facts, the Court had little trouble concluding that the statement was testimonial. *Id.* at 68, 124 S.Ct. 1354.

We first applied what guidance there was in *Crawford* to statements made to a 911 operator and to police officers during a field investigation. *State v. Wright*, 701 N.W.2d 802 (Minn.2005), *vacated and remanded*, —— U.S. ——, 126 S.Ct. 2979, 165 L.Ed.2d 985 (2006). In *Wright*, in the absence of a more definitive explanation from the Supreme Court, we listed eight considerations we thought relevant to whether a statement is testimonial. *Id.* at 812–13. Those considerations included such things as "whether the declarant was a victim or an observer" and "whether it was the police or the declarant who initiated the conversation." *Id.* at 812.[1]

---

1. The eight considerations we listed were: (1) whether the declarant was a victim or an observer; (2) the declarant's purpose in speaking with the officer; (3) whether it was the police or the declarant who initiated the conversation; (4) the location where the statements were made; (5) the declarant's emotional state; (6) the level of formality and structure of the conversation; (7) the officer's purpose in speaking with the declarant; and

We then applied our eight-part test to statements by child sexual abuse victims in *State v. Bobadilla*, 709 N.W.2d 243 (Minn. 2006), and *State v. Scacchetti*, 711 N.W.2d 508 (Minn.2006). In *Bobadilla*, the court concluded that statements by a child sexual abuse victim to a child protection worker were not testimonial by reference to what it concluded was the "main purpose" of the interview: "assessing and responding to imminent risks to [the child's] health and welfare." 709 N.W.2d at 255. I dissented in *Bobadilla* because the interview of the child was part of a police interrogation, in the presence of a police officer, conducted by "a government official who was taking the statement as a surrogate interviewer for the police." *Id.* at 257 (Page, J., dissenting). In *Scacchetti*, we concluded that the child's statements were not testimonial because they were made to a pediatric nurse practitioner whose "purpose in interviewing and examining [the child] was to assess her medical condition," 711 N.W.2d at 515; "no government actor initiated, participated, or was involved in any way," *id.* at 514.

But then came the Supreme Court's decisions in *Davis v. Washington* which, in my view, significantly altered the testimonial landscape. There were two statements at issue in Davis and its companion case, *Hammon v. Indiana*. In *Davis*, as in *Wright*, the statement at issue was a call to a 911 operator made by Davis's former girlfriend, which began, "He's here jumpin' on me again." 126 S.Ct. at 2271. The 911 operator determined whether the call was being made from a house or an apartment, whether there were any weapons involved, whether the assailant had been drinking, the assailant's name and birth date, and the fact that the assailant was leaving the scene in a car with someone else. *Id.* When the former girlfriend did not testify

(8) if and how the statements were recorded.

at trial, the tape of her 911 call was admitted instead. *Id.*

In *Hammon*, the statements at issue were made by Hammon's wife, at the couple's home, to police responding to a reported domestic disturbance. 126 S.Ct. at 2272. When police arrived at the home, Hammon's wife was on the front porch, and denied to the officers that anything was wrong. *Id.* After Hammon himself admitted there had been an argument, and after the officers observed physical evidence of a fight, the officers took Hammon's wife into another room and asked her a second time what had happened. *Id.* As Hammon protested, his wife first told officers and then wrote out an affidavit to the effect that Hammon had shoved her to the floor on broken glass, hit her, disabled the phone and her van, and attacked her daughter. *Id.* After Hammon's wife defied a subpoena and refused to testify at trial, the district court allowed the responding officers to testify as to her statements to them as "excited utterances" and admitted her affidavit as a "present sense impression." *Id.*

The Court concluded that while the statement in Davis was not testimonial, the statement in *Hammon* was. *See id.* at 2280. Comparing the two statements, the Court observed:

> The statements in *Davis* were taken when McCottry [Davis's former girlfriend] was alone, not only unprotected by police (as Amy Hammon [Hammon's wife] was protected), but apparently in immediate danger from Davis. She was seeking aid, not telling a story about the past. McCottry's present-tense statements showed immediacy; Amy's narrative of past events was delivered at some remove in time from the danger she described. And after Amy answered

*Wright,* 701 N.W.2d at 812–13.

the officer's questions, he had her execute an affidavit, in order, he testified, "[t]o establish events that have occurred previously."

*Id.* at 2279. The Court summarized its overall holding this way:

Without attempting to produce an exhaustive classification of all conceivable statements—or even all conceivable statements in response to police interrogation—as either testimonial or nontestimonial, it suffices to decide the present cases to hold as follows: Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Id.* at 2273–74.

In the Court's discussion of the differences between the results in *Crawford*, *Davis*, and *Hammon*, there is significance for this case. In *Davis*, the Court distinguished between "interrogations solely directed at establishing the facts of a past crime, in order to identify (or provide evidence to convict) the perpetrator," on the one hand, and "[a] 911 call, on the other hand, and at least the initial interrogation conducted in connection with a 911 call," which the Court observed "is ordinarily not designed primarily to 'establis[h] or prov[e]' some past fact, but to describe current circumstances requiring police assistance." 126 S.Ct. at 2276. The Court contrasted McCottry's 911 call in *Davis* with the police questioning of Sylvia Crawford:

The difference between the interrogation in *Davis* and the one in *Crawford* is apparent on the face of things. In *Davis*, McCottry was speaking about events *as they were actually happening*, rather than "describ[ing] past events." Sylvia Crawford's interrogation, on the other hand, took place hours after the events she described had occurred. Moreover, any reasonable listener would recognize that McCottry (unlike Sylvia Crawford) was facing an ongoing emergency. Although one *might* call 911 to provide a narrative report of a crime absent any imminent danger, McCottry's call was plainly a call for help against bona fide physical threat. Third, the nature of what was asked and answered in *Davis*, again viewed objectively, was such that the elicited statements were necessary to be able to *resolve* the present emergency, rather than simply to learn (as in *Crawford*), what had happened in the past. That is true even of the operator's effort to establish the identity of the assailant, so that the dispatched officers might know whether they would be encountering a violent felon. And finally, the difference in the level of formality between the two interviews is striking. Crawford was responding calmly, at the station house, to a series of questions, with the officer-interrogator taping and making notes of her answers; McCottry's frantic answers were provided over the phone, in an environment that was not tranquil, or even (as far as any reasonable 911 operator could make out) safe.

126 S.Ct. at 2276–77 (citations omitted). According to the Court, McCottry "simply was not acting as a *witness*; she was not *testifying*." *Id.* at 2277.

In contrast, the statements in *Hammon* "were not much different from the statements [the Court] found to be testimonial in *Crawford*." *Id.* at 2278. The question-

ing of Hammon's wife "was part of an investigation into possibly criminal past conduct." *Id.* "There was no emergency in progress." *Id.* The Court noted, "[o]bjectively viewed, the primary, if not indeed the sole, purpose of the interrogation was to investigate a possible crime." *Id.* And, although the Court acknowledged that the questioning in *Crawford* was "more formal," *id.*, the questioning in *Hammon* was "formal enough." *Id.*

> What we called the "striking resemblance" of the *Crawford* statement to civil-law *ex parte* examinations is shared by Amy's statement here. Both declarants were actively separated from the defendant—officers forcibly prevented [Hammon] from participating in the interrogation. Both statements deliberately recounted, in response to police questioning, how potentially criminal past events began and progressed. And both took place some time after the events described were over. Such statements under official interrogation are an obvious substitute for live testimony, because they do precisely *what a witness does* on direct examination; they are inherently testimonial.

*Id.* (citations omitted).

From the Supreme Court's reasoning in *Davis,* it appears to me that some of the eight factors we recounted in *Wright*— such as whether the declarant was a victim or an observer—may no longer be germane to the analysis. Instead, the Court's distinction between testimonial and nontestimonial statements appears to depend on four factors: (1) when the statement was made (for example, whether the statement was made contemporaneous with or after the incident); (2) what the statement describes (for example, whether the statement describes a current emergency or past events); (3) if describing a current emergency, whether the declarant's state-

ment is necessary to resolve the current emergency; and (4) the circumstances giving rise to the statement (such as by whom the statement was initiated and the level of its formality).

From what this record discloses about T.K.'s statements to MCRC, they are testimonial. The questioning took place approximately 18 months after Krasky's last contact with T.K. There was no current emergency; as the court acknowledges, by the time T.K. was interviewed at MCRC, Krasky had already been incarcerated and his parental rights had been terminated. T.K.'s statements to MCRC recounted, in response to questions, how past criminal events began and progressed. That is to say, the nurse elicited from T.K. a narrative of her alleged abuse at the hands of Krasky. The questioning was intended as a substitute for, and indeed produced, "precisely what a witness does on direct examination." *Davis,* 126 S.Ct. at 2278. Indeed, the nurse began her questioning of T.K. by asking T.K. to do what the court asks witnesses to do: promise to tell the truth. Finally, the interview at MCRC was at the behest of government actors, having been arranged by the police, in conjunction with a county social worker. On this record, T.K.'s statements at MCRC were testimonial and therefore inadmissible in the absence of T.K.'s testimony or a previous opportunity for Krasky to cross-examine her.

The court in this case rests its decision on what it characterizes as "the primary purpose of T.K.'s statements to Carney," that is, "to assess and protect T.K.'s health and welfare." Doing so is misguided. First, to say the "primary purpose" of the statement was to assess T.K.'s health begs the question because that "primary purpose" does not alter the fact that another purpose for taking the statement was to assist in the prosecution of Krasky. Sec-

ond, Carney's purpose in questioning T.K. may have been to assess T.K.'s health, but it cannot be said on this record that T.K. had any understanding of why she was at MCRC and therefore I cannot assume that in answering Carney's questions T.K. thought she was protecting her health and welfare. Finally, even if T.K. understood the purpose of the MCRC examination, it seems to me that the court's reliance on "the primary purpose of T.K.'s statements to Carney" is simply a fallback to the historical underpinnings of the hearsay exception under Minn. R. Evid. 803(4) for "[s]tatements made for purposes of medical diagnosis and treatment," namely, that statements made for purposes of medical treatment provide " 'special assurance of reliability' " because of " 'the patient's belief that accuracy is essential to effective treatment.' " *State v. Robinson*, 718 N.W.2d 400, 404 (Minn.2006) (quoting 2 John W. Strong, et al., *McCormick on Evidence* § 277, at 247 (4th ed.1992)). If anything is clear in the Supreme Court's definition of "testimony," it is that statements are not to be categorized as "nontestimonial" (and therefore admissible) simply because a court believes them to be inherently reliable. *See Crawford*, 541 U.S. at 61, 124 S.Ct. 1354 ("Admitting statements deemed reliable by a judge is fundamentally at odds with the right of confrontation."). I therefore conclude that T.K.'s statements at MCRC are testimonial under Davis.

The statements were also properly excluded from evidence for another reason.

This appeal arises because the district court ruled that T.K. was incompetent to testify at trial. The basis for the court's incompetency finding is the court's determination that T.K. "lacks the capacity to truthfully and accurately relate the facts about the defendant's alleged abuse." There was no separate evidentiary hearing in this matter on T.K.'s competency; rather, the state "stipulated" that T.K. was not competent to testify. In a memorandum attached to its order on competency, the court describes T.K.'s demeanor during the interview at MCRC and her answers to the nurse's questions. As a result, the evidentiary bases for the court's competency determination are the very statements the state proposed to admit at trial in lieu of T.K.'s testimony—that is, her interview at MCRC, described by the court as follows:

> TLK is six years old, suffers from developmental delays to such an extent that she was held back in school last year, and receives special educational services. During her visit to MCRC, she inaccurately stated that her birthday was the day before the interview, and when asked if she knew what "true and real" means, she responded "There's fish outside." When asked to promise to talk about only things that are "true and real," TLK did not respond. When asked again, she looked at the floor and nodded her head slightly. TLK lacks the capacity to truthfully and accurately relate the facts about the defendant's alleged abuse. She is not competent to testify at trial, and is therefore unavailable at trial.

Thus, this is not a case like *Crawford* or *Davis*, in which the unavailable witness is an adult who was presumably competent at the time of the out-of-court statements that were at issue in those cases. Nor is this a case in which the witness could be presumed competent at the time of the out-of-court statement but has become incompetent in the interim, for example as a result of illness. Nor is this a case in which the court made a later determination as to competency based on T.K.'s responses to questions in a separate competency hearing. Rather, this is a case in

which the witness was not competent when she made the out-of-court statement, *as demonstrated by the out-of-court statement itself.* As such, it should be beyond dispute that T.K.'s out-of-court statements are therefore inadmissible under any circumstances.

The Supreme Court has apparently not addressed such a conundrum directly, but I find the Court's statements in *Idaho v. Wright,* 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990), a strong indication that it would reach the same conclusion. *Idaho v. Wright* also involved a Confrontation Clause challenge to the admissibility of the out-of-court statements of a child sexual abuse victim. *Id.* at 808, 110 S.Ct. 3139. Although the Court analyzed the matter under Idaho's "residual hearsay exception," *id.* at 817, 110 S.Ct. 3139, the Court specifically rejected the defendant's contention that the child's out-of-court statements were unreliable per se, because the child had been ruled only "unavailable" to testify and not "incompetent":

> Finally, we reject respondent's contention that the younger daughter's out-of-court statements in this case are *per se* unreliable, or at least presumptively unreliable, on the ground that the trial court found the younger daughter incompetent to testify at trial. First, respondent's contention rests upon a questionable reading of the record in this case. The trial court found only that the younger daughter was "not capable of communicating to the jury." Although Idaho law provides that a child witness may not testify if he "appear[s] incapable of receiving just impressions of the facts respecting which they are examined, or of relating them truly," the trial court in this case made no such findings. Indeed, the more reasonable inference is that, by ruling that the statements were admissible under Idaho's residual hearsay exception, the trial

court implicitly found that the younger daughter, at the time she made the statements, was capable of receiving just impressions of the facts and of relating them truly. In addition, we have in any event held that the Confrontation Clause does not erect a *per se* rule barring the admission of prior statements of a declarant who is unable to communicate to the jury at the time of trial. Although such inability might be relevant to whether the earlier hearsay statement possessed particularized guarantees of trustworthiness, a *per se* rule of exclusion would not only frustrate the truth-seeking purpose of the Confrontation Clause, but would also hinder States in their own "enlightened development in the law of evidence."

497 U.S. at 824–25, 110 S.Ct. 3139 (citations omitted). We have similarly excluded statements made by witnesses who were judged incompetent at the time the statements were made. *See, e.g., Ammundson v. Tinholt,* 228 Minn. 115, 120, 36 N.W.2d 521, 524 (1949) (excluding statements made by a husband who had just witnessed his wife's car accident on grounds that he lacked capacity at the time of the statement to recollect and narrate the facts to which the statements related).

Again, this is not a case of a witness whose only problem is the inability to communicate to the jury at the time of trial. This is a case of a witness who, when she made the very statements that the state proposes to admit in lieu of her testimony at trial, was incompetent to testify because she lacked "the capacity to truthfully and accurately relate the facts about the defendant's alleged abuse" to MCRC as well as to the jury. I would affirm the district court: under the facts of this case, such statements simply are not admissible on any grounds.

Finally, I note that only T.K.'s statements to Carney during the MCRC are at issue here. *Crawford* distinguished between "[a]n accuser who makes a formal statement to government officers" and "a person who makes a casual remark to an acquaintance." 541 U.S. at 51, 124 S.Ct. 1354. This case began after T.K.'s foster mother reprimanded her for inappropriately touching T.K.'s sister, and T.K. defended herself on grounds that Krasky did the same to her. I do not believe that the Supreme Court's concern with testimonial statements in *Crawford* and *Davis* is meant to reach T.K.'s spontaneous statements to her foster mother that alerted the foster mother to the possibility of abuse in the first place. Nor does T.K.'s age-inappropriate behavior, such as pretending to masturbate, constitute testimony. Similarly, although I find T.K.'s statements to Carney inadmissible, the results of Carney's physical examination of T.K. would still be admissible. Thus, without expressing any opinion as to the viability of the state's case on remand, I do not believe that excluding T.K.'s statements to Carney necessarily bars prosecution of Krasky.

I respectfully dissent.

ANDERSON, PAUL H., Justice (dissenting).

I join in the dissent of Justice Page.